2004-NMSC-015

90 P.3d 477

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Robert YOUNG and Reis B. Lopez,
Defendants–Appellants.**

**State of New Mexico, Plaintiff–Appellee,**

v.

**David Sanchez, Defendant–Appellant.**

**Nos. 27,999, 28,022.**

Supreme Court of New Mexico.

April 21, 2004.

Billy Blackburn, Gerald Baca, Albuquerque, for Appellant Robert Young.

Jacquelyn Robins, Joe M. Romero, Jr., Albuquerque, for Appellant Reis Lopez.

Patricia A. Madrid, Attorney General, Ralph E. Trujillo, Assistant Attorney General, Albuquerque, for Appellee.

Law Offices of Nancy L. Simmons, P.C., Nancy L. Simmons, Albuquerque, for Appellant.

Patricia A. Madrid, Attorney General, Ralph E. Trujillo, Assistant Attorney General, Albuquerque, for Appellee.

## OPINION

SERNA, Justice.

{1} Defendants David Sanchez, Robert Young, and Reis Lopez are charged by grand jury indictment with the first degree murder of Ralph Garcia, in addition to other charges. The killing took place on August 31, 1999, at the Guadalupe County Correctional Facility (GCCF), where Garcia was a correctional employee and Defendants were inmates.

The State seeks the death penalty based on two aggravating factors, murder of a peace officer and murder by an inmate of one who is lawfully on the premises of a penal institution. *See* NMSA 1978, § 31–20A–5(A), (D) (1981). Defendants moved to dismiss both aggravating circumstances on several grounds. *See State v. Ogden*, 118 N.M. 234, 239, 880 P.2d 845, 850 (1994) ("A defendant who has been notified that the State will seek the death penalty may move to dismiss an aggravating circumstance before trial."). They argue that corrections officers are not peace officers, that Garcia was not a peace officer because he had not completed the appropriate training, that GCCF was not a penal institution within the meaning of the Capital Felony Sentencing Act, and that Garcia was not lawfully on the premises of GCCF. The district court denied the motions to dismiss, finding that the State had probable cause for both aggravating circumstances. Reviewing the district court's ruling on interlocutory appeal, we affirm.

## I. Standard of Review

▮▮▮ {2} In *Ogden*, we established guidelines for the district court to follow in ruling on a motion to dismiss an aggravating circumstance. Aggravating circumstances are not elements of the crime of first degree murder, *see* NMSA 1978, § 30–2–1(A) (1994), and thus they "are not required to be formally charged in an indictment or ruled on by the grand jury for the existence of probable cause." *Ogden*, 118 N.M. at 241, 880 P.2d at 852. Once the State files a notice of intent to seek the death penalty, however, we endorsed a pretrial evaluation of a defendant's motion to dismiss aggravating circumstances through a circumscribed evidentiary hearing. *Ogden*, 118 N.M. at 239–40, 880 P.2d at 850–51. "Such a hearing should be summary in nature; we have no intention of allowing a trial within a trial on a pretrial challenge to aggravating circumstances." *Id.* at 240, 880 P.2d at 851. We noted that "[t]he burden of proof is on the State." *Id.* However, we also explained that it is important for courts not to interfere with the charging discretion of the prosecutor. *Id.* at 240–41, 880 P.2d at 851–52. As a result, a probable cause standard applies at the pretrial determination,

and "the State will defeat the motion if it proves that there is probable cause to believe an aggravating circumstance is present." *Id.* at 240, 880 P.2d at 851. In order to establish probable cause, the State need not adduce evidence establishing a challenged aggravating circumstance beyond a reasonable doubt; the question instead is "whether there is that degree of evidence to bring within reasonable probabilities the fact that [an aggravating circumstance] was committed by the accused." *State v. Garcia*, 79 N.M. 367, 368–69, 443 P.2d 860, 861–62 (1968). "Pretrial review of aggravating circumstances is intended to screen out only those cases in which the State does not have any significant factual or legal basis for pursuing the death penalty, and the probable cause standard of review should reflect this objective." *Ogden*, 118 N.M. at 240, 880 P.2d at 851.

▮▮▮ {3} We also explained in *Ogden* that "[p]retrial rulings on the support of aggravating circumstances can present questions of fact, law, or mixed fact and law, and this will affect the standard of review." *Id.* at 239, 880 P.2d at 850. "A motion to dismiss an aggravating circumstance that presents a purely legal question should be granted when the district court finds that the aggravating circumstance does not apply as a matter of law." *Id.* "When the applicability of an aggravating circumstance raises a question of fact or a mixed question of fact and law, the district court should grant the defendant's motion to dismiss the aggravating circumstance only when it finds that there is not probable cause to support the aggravating circumstance." *Id.* at 240, 880 P.2d at 851. For motions involving issues of fact or mixed issues of fact and law, "[t]he district court must not weigh the evidence or consider evidence of mitigating circumstances." *Id.* "[D]istrict courts should be aware of the potential for impeding prosecutorial charging discretion, and they should confine their review" as outlined in *Ogden*. *Id.* at 241, 880 P.2d at 852. "On appeal, we will review questions of law de novo, and we will review questions of fact to see whether the district court correctly evaluated probable cause to

support the aggravating circumstance." *Id.* at 240, 880 P.2d at 851.

## II. The Aggravating Circumstance of Murder by an Inmate at a Penal Institution

{4} In enumerating the aggravating circumstances that make a first degree murder eligible for the death penalty under the Capital Felony Sentencing Act, the Legislature has specified that it is an aggravating circumstance if, "while incarcerated in a penal institution in New Mexico, the defendant, with the intent to kill, murdered a person who was at the time incarcerated in or lawfully on the premises of a penal institution in New Mexico." Section 31–20A–5(D). The State alleged in its notice of intent to seek the death penalty that Defendants murdered Garcia with the intent to kill while he was lawfully on the premises of GCCF, a penal institution in New Mexico. Defendants claim that this aggravating circumstance should not apply in this case because GCCF is not a "penal institution" within the meaning of Section 31–20A–5(D) or because Garcia was not lawfully on the premises. We reject both of these arguments.

{5} "The chief aim of statutory construction is to give effect to the intent of the legislature." *Roth v. Thompson,* 113 N.M. 331, 332, 825 P.2d 1241, 1242 (1992). "[T]he plain language of the statute [is] the primary indicator of legislative intent." *Whitely v. N.M. State Pers. Bd.,* 115 N.M. 308, 311, 850 P.2d 1011, 1014 (1993). The Legislature specifically instructed that "penal institution" in Section 31–20A–5(D) "includes facilities under the jurisdiction of the corrections and criminal rehabilitation department and county and municipal jails."[1] In a different provision, the Legislature provided that "local jail" includes facilities operated "by a private independent contractor pursuant to an agreement with a county, municipality or combination of such local governments." NMSA 1978, § 33–3–28(D)(2) (1985). *See generally Ogden,* 118 N.M. at 243, 880 P.2d at 854 ("Statutes on the same

general subject should be construed by reference to each other . . . ."); *Roth,* 113 N.M. at 334, 825 P.2d at 1244 ("A fundamental rule of statutory construction is that all provisions of a statute, together with other statutes in pari materia, must be read together to ascertain the legislative intent."). In addition, the Legislature has stated that "[c]ontracts between local public bodies and private independent contractors for the operation, or provision and operation, of a jail are specifically authorized." NMSA 1978, § 33–3–1(B) (1984).

{6} In accordance with this statutory authority, Wackenhut Corrections Corp. had a contract with the County to operate GCCF as a correctional facility. Pursuant to a separate contract between the County and the Department of Corrections, which was incorporated into the County's contract with Wackenhut, GCCF housed inmates, including Defendants, who were committed to the supervision of the Department of Corrections. These inmates were subject to the typical consequences of incarceration in a public facility, such as receiving time served on their sentences and being subject to prosecution for escape or other crimes directed at inmates, *see* NMSA 1978, § 30–22–8 (1963) ("Escape from jail consists of any person who shall have been lawfully committed to *any* jail, escaping or attempting to escape from such jail.") (emphasis added), and the administrators of GCCF were obligated to comply with specific statutory duties, including the maintenance of a clean facility and the provision of food for the prisoners, NMSA 1978, §§ 33–3–5 (1984) (applying to "independent contractor[s]"), –6 (1984) (same). We believe it is clear that GCCF is a penal institution within the plain language of Section 31–20A–5. The fact that GCCF housed inmates from the Department rather than county inmates is immaterial both for the definition of "local jail" in Section 33–3–28 and the definition of "penal institution" in Section 31–20A–5(D). Thus, GCCF is a penal institution within the plain language of the statute.

---

1. We note that, by using the word "includes," the Legislature did not intend to create an exhaustive list of penal institutions.

{7} Defendants also claim that Garcia was not lawfully on the premises at the time of the killing because he had not completed his training as a corrections officer. The County's contracts with Wackenhut and the Department of Corrections provided that GCCF corrections officers receive training that complied with Department and County policies. The contracts further provided that the Department would train all corrections officers at its main training academy or at GCCF, which would be designated as a branch of the Department's training academy for this limited purpose. After being hired by Wackenhut in January 1999, Garcia attended a ten-week training program at the Department's main training academy. However, Garcia did not receive his certification from the Department because he did not pass an AR–15 rifle test. The Department issued a waiver of certification for Garcia's duties inside the facility pending Garcia's retaking of the rifle test and instructed Wackenhut not to allow Garcia to assume the duties of an armed post, meaning work patrol and transport. Although Garcia was scheduled to attend another rifle training session, he could not attend because of car problems, and the waiver from the Department expired on May 31, 1999. Garcia was later trained in the use of a shotgun and pistol, but he did not attend another training session for the AR–15 rifle prior to his death and thus had not been certified as a corrections officer by the Department. Following Garcia's death, the Department notified Wackenhut that it was not to allow uncertified individuals to work on posts designated for correctional officers. From the time it began operating GCCF through the time of the alleged murder, Wackenhut had used only shotguns and pistols at the correctional facility and did not use the AR–15 rifle. The Department's training academy branch at GCCF did not require AR–15 rifle training, and the Wackenhut corrections officers who attended training at this branch, rather than the main training academy Garcia attended, received certification from the Department despite the absence of AR–15 rifle training.

{8} In arguing that Garcia's presence on the premises of GCCF was unlawful due to his lack of certification, we believe that De-

fendants overlook the plain language and purpose of the statute. Section 31–20A–5(D) applies to anyone lawfully on the premises of a penal institution, not just certified corrections officers. Thus, this provision includes other employees at the institution who are not certified corrections officers, as well as visitors and other inmates. The completeness of Garcia's training had no effect on Garcia's lawful presence at GCCF. Garcia was an employee of GCCF and was authorized by GCCF administrators to be on the premises at the time of the killing. In their motions to dismiss, Defendants challenged that Garcia was a peace officer within the meaning of Section 31–20A–5(A), which is discussed further below. However, Defendants did not challenge the State's allegation that Garcia was murdered while acting in the course of his duties as a GCCF employee, and Defendant Sanchez noted in his motion to dismiss that "it is undisputed that [Garcia] was employed by the Wackenhut Corporation and working as a correctional officer at the time of his death." Garcia was therefore lawfully present at the facility within the plain meaning of Section 31–20A–5(D).

{9} Further, the legislative purpose of this aggravating circumstance is to deter inmates from committing murder. See *Roberts v. Southwest Cmty. Health Servs.*, 114 N.M. 248, 251, 837 P.2d 442, 445 (1992) ("Statutes should be construed so as to facilitate their operation and the achievement of the goals as specified by the legislature."). We believe that Defendants' construction of the statute would frustrate this legislative purpose. We believe that the Legislature intended to deter inmates from murdering correctional officers with a technical deficiency in training to the same extent as the murder of other corrections employees, fellow inmates, and visitors. We conclude that this argument is without merit, see *Ogden*, 118 N.M. at 241 n. 9, 880 P.2d at 852 n. 9, and we affirm the district court's ruling that there was probable cause for this aggravating circumstance.

### III. The Aggravating Circumstance of Murder of a Peace Officer

{10} As a separate aggravating circumstance, the Legislature included cases in

which "the victim was a peace officer who was acting in the lawful discharge of an official duty when he [or she] was murdered." Section 31–20A–5(A). In its notice of intent to seek the death penalty, the State alleged that Garcia was a peace officer acting in the lawful discharge of an official duty when he was murdered. Defendants argue that this aggravating circumstance is inapplicable in this case for three reasons: (1) corrections officers and jailers are not peace officers within the meaning of Section 31–20A–5(A); (2) the employees of GCCF were neither corrections officers nor jailers; or (3) Garcia was not a corrections officer or jailer, and therefore not a peace officer, at the time of his alleged murder. For the reasons that follow, we conclude that there is probable cause to support this aggravating circumstance.

**A. Whether Corrections Officers and Jailers are Peace Officers**

■ {11} Defendants first claim that the Legislature did not intend to include corrections officers and jailers in its reference to "peace officers" in Section 31–20A–5(A). Defendants contend that corrections officers, whose principal duty is to hold individuals in custody rather than to maintain public order, perform a different role than peace officers. Defendants argue that corrections officers only occasionally act in the role of peace officers, when making an arrest or enforcing laws on the premises of a New Mexico correctional facility. Defendants also argue that Section 31–20A–5 protects corrections officers in other ways, by establishing an inmate's murder of employees of the Department of Corrections as one aggravating circumstance, Section 31–20A–5(E), and an inmate's murder of anyone lawfully on the premises of a penal institution as another aggravating circumstance, Section 31–20A–5(D). Defendants contend based on these provisions that the Legislature would have expressly included corrections officers in Section 31–20A–5(A) if it had intended to provide them with additional protection as peace officers. We review de novo the district court's determination that corrections officers and jailers are peace officers for purposes of Section 31–20A–5(A). *See Og-*

*den,* 118 N.M. at 240, 880 P.2d at 851; *see also State v. Rowell,* 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995) ("Interpretation of a statute is an issue of law . . . .").

■ {12} In *Ogden,* this Court noted that there is no directly applicable definition for "peace officer" in Section 31–20A–5(A). 118 N.M. at 241, 243, 880 P.2d at 852, 854. Relying on general rules of statutory construction, we focused on the purpose of the statute and noted that the strict construction of punitive statutes "should not be used to defeat the policy and purposes of a statute." *Id.* at 242, 880 P.2d at 853. "[T]he language of penal statutes should be given a reasonable or common sense construction consonant with the objects of the legislation, and the evils sought to be overcome should be given special attention." *Id.* at 243, 880 P.2d at 854.

{13} The State in *Ogden* sought the death penalty for the murder of a community service officer (CSO). *Id.* at 237, 880 P.2d at 848. The CSO position in that case involved tasks that had, prior to the creation of the position, been performed by city police officers, including traffic control, investigation of private property accidents, close patrol of residences, service of subpoenas, and investigation of certain misdemeanors. *Id.* at 237–38, 880 P.2d at 848–49. CSOs were not trained in prisoner contact or control or dispatched to incidents in which suspect contact was anticipated. *Id.* at 238, 880 P.2d at 849. They did not carry guns, nor were they authorized to make arrests. *Id.* However, CSOs wore uniforms similar to those worn by city police officers and drove marked patrol cars. *Id.* In addition, CSOs received their assignments from the city chief of police and were supervised by sergeants in the city police department. *Id.*

{14} Based on these facts, the district court in that case had found that CSOs are not peace officers within the meaning of Section 31–20A–5(A) because they are not expressly recognized as peace officers by statute. *Id.* at 243, 880 P.2d at 854. We rejected this interpretation. "When a statutory term is not defined, it must be given its plain and ordinary meaning. The popularly

understood meaning of 'peace officer' is a police officer, sheriff, or other law enforcement official who keeps the peace by patrolling public areas and enforcing the law." *Id.* at 243–44, 880 P.2d at 854–55 (citations omitted). "The purpose of Section 31–20A–5(A) is to deter the killing of law enforcement officers by enhancing the penalty for committing that crime. . . . [T]he deterrent value of this penalty enhancement is thought to provide extra protection to law enforcement officers, thereby encouraging their service." *Id.* at 244, 880 P.2d at 855. "[B]y using the term 'peace officer,' Section 31–20A–5(A) demonstrates the legislature's intention to protect a broader category of law enforcement officers than only police officers." *Id.* "[O]ur emphasis should focus on the maintenance of public order or peace requirement . . . ." *Id.* at 245, 880 P.2d at 856.

{15} Applying these principles, we concluded in *Ogden* that CSOs are peace officers within the meaning of Section 31–20A–5(A). *Id.* at 244–45, 880 P.2d at 855–56. We highlighted the fact that "CSOs are charged with the duty to maintain public peace or order." *Id.* at 245, 880 P.2d at 856. We also noted that "CSOs are threatened in their positions in the same way that police officers are, except that CSOs have less frequent contact with suspects who are known to be dangerous." *Id.* at 244, 880 P.2d at 855. We use our analysis of CSOs in *Ogden* as a guide to our determination of whether corrections officers and jailers fall within the meaning of "peace officer" in Section 31–20A–5(A).

{16} Based on our analysis in *Ogden*, the question we must address in this case is whether corrections officers and jailers maintain public order or peace in such a way that the Legislature intended to provide them with extra protection to encourage their service and deter violent acts against them. We answer this question by turning to other statutes dealing with peace officers, including those specifically applying to jailers and corrections officers.

{17} The Legislature has defined "peace officer" for purposes of the Criminal Code as "any public official or public officer vested by law with a duty to maintain public order or to make arrests for crime, whether that duty extends to all crimes or is limited to specific crimes." NMSA 1978, § 30–1–12(C) (1963). This Court has held that jailers are included in this statute because "[a] jailer is an officer in the public domain, charged with the duty to maintain public order." *State v. Rhea*, 94 N.M. 168, 169, 608 P.2d 144, 145 (1980). Consistent with *Rhea*, the Legislature has specifically provided that

[j]ailers and any employee of a local jail who has, at the particular time, the principal duty to hold in custody any person accused or convicted of a criminal offense or placed in the legal custody or supervision of a local jail shall have the power of a peace officer with respect to arrests and enforcement of laws when on the premises of a local jail, while transporting a person committed to or under the supervision of a local jail, while supervising any person committed to or under the supervision of a local jail anywhere within the state or when engaged in any effort to pursue or apprehend such a person.

Section 33–3–28(A). The Legislature further provided that "[c]rimes against a jailer, including those persons employed by an independent contractor, shall be deemed the same crimes and shall bear the same penalties as crimes against a peace officer." Section 33–3–28(C).

{18} Following our decision in *Rhea*, the Court of Appeals held that corrections officers were not "peace officers" within the meaning of Section 30–1–12(C) because, unlike jailers, the statute specifically governing corrections officers, NMSA 1978, § 33–1–10 (1984, prior to 1986 & 1987 amendments), did not at that time state that crimes against corrections officers are to be treated as crimes against peace officers, even though Section 33–1–10 did give corrections officers the power of a peace officer with respect to arrests and enforcement of laws when on the premises of a New Mexico correctional facility or while transporting a person committed to or under the supervision of the corrections department. *State v. Tabaha*, 103 N.M. 789, 790–91, 714 P.2d 1010, 1011–12 (Ct.App. 1986). However, in response to *Tabaha*, "[t]he legislature subsequently amended the

correctional officers statute to provide that crimes against correctional officers and employees of the Corrections Department acting as peace officers were deemed crimes against peace officers." *State v. Gutierrez*, 115 N.M. 551, 552, 854 P.2d 878, 879 (Ct.App. 1993). Based on the Legislature's response to *Tabaha*, it is clear that the Legislature intended to treat corrections officers, like jailers, as peace officers for the purpose of crimes committed against them when they are making arrests or enforcing the laws. *See* NMSA 1978, § 33–1–10(B) (1987).

{19} The definition of "peace officer" in Section 30–1–12(C) is not directly applicable to Section 31–20A–5(A) because that definition applies only to the Criminal Code, *Ogden*, 118 N.M. at 243, 880 P.2d at 854; however, as a statute on the same general subject, this definition is a helpful guide in determining the Legislature's intent. *See id.* at 245, 880 P.2d at 856. In addition, we believe that Section 33–3–28 and Section 33–1–10 apply directly to our interpretation of Section 31–20A–5(A). In contrast to Section 30–1–12(C), which expressly limits its application to uses of the term "peace officer" within the Criminal Code, the statutory provisions designating corrections officers and jailers as "peace officers" do not contain the same limitation. "Crimes against a correctional officer or an employee of the corrections department while in the lawful discharge of duties which confer peace officer status pursuant to this section shall be deemed the same crimes and *shall bear the same penalties* as crimes against a peace officer." Section 33–1–10(B) (emphasis added); *accord* § 33–3–28(C). Section 31–20A–5(A) concerns a penalty for a crime

against a peace officer, and therefore, Section 33–1–10 and Section 33–3–28 serve as powerful indicators of the Legislature's intent in Section 31–20A–5(A). These statutes evince an intent on the part of the Legislature to treat corrections officers, jailers, and any employee of a local jail whose principal duty is to hold inmates in custody as peace officers for purposes of Section 31–20A–5(A) when these individuals are murdered during the discharge of duties conferring peace officer status.[2]

{20} Defendants speculate that this Court believed in *Ogden* that corrections officers are not peace officers because we cited a case from another jurisdiction, *People v. Perry*, 27 Ill.App.3d 230, 327 N.E.2d 167, 170–71 (1975), which we parenthetically described as "concluding that private security guards and jailers are not 'peace officers' because their duty to maintain public order is confined to a specific time and place." *Ogden*, 118 N.M. at 245, 880 P.2d at 856. However, Illinois' statutes with respect to jailers and corrections officers differ from those enacted by our Legislature. *See Perry*, 327 N.E.2d at 171 ("[W]e do not mean to suggest that the definition of a peace officer is absolutely rigid and cannot be expanded by the legislature. Other states have specifically expanded that definition to include such law enforcement personnel as … jail guards …."). As compared to our citation to *Perry*, we believe it is more significant that we recited in *Ogden* the Legislature's amendment of Section 33–1–10 in response to *Tabaha* as "further evidence that the legislature intended [Section] 31–20A–5(A) to be interpreted broadly." *Ogden*, 118 N.M. at 244 n. 11, 880 P.2d at 855 n. 11. Based on this reference to juvenile correc-

**2.** Defendants rely on a case from the Court of Appeals, *Callaway v. N.M. Dep't of Corr.*, 117 N.M. 637, 641, 875 P.2d 393, 397 (Ct.App.1994), which held that corrections officers are not law enforcement officers as that term is used in the Tort Claims Act, *see* NMSA 1978, § 41–4–3(D) (2003) (defining "law enforcement officer" as a "full-time salaried public employee of a governmental entity whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes"). We believe this authority is inapposite because it interpreted a different term in a different context. For crimes committed against jailers and corrections offi-

cers, and the associated penalties for such crimes, including capital sentencing, the Legislature made its intent explicit in Section 33–3–28 and Section 33–1–10. We also note that we have previously held, consistent with our interpretation of "peace officer" in *Rhea*, that jailers at county jails are law enforcement officers within the meaning of Section 41–4–3(D). *Methola v. County of Eddy*, 95 N.M. 329, 332, 622 P.2d 234, 237 (1980); *see Davis v. Bd. of County Comm'rs*, 1999–NMCA–110, ¶ 35, 127 N.M. 785, 987 P.2d 1172 (applying *Methola* to the director of a county detention center). We need not address in this opinion any potential conflict in the cases interpreting Section 41–4–3(D).

tions officers, as well as the context surrounding *Tabaha*, including this Court's determination in *Rhea* that jailers fall within the general Criminal Code definition of peace officers, we believe this Court understood in *Ogden*, as we hold in this opinion, that the Legislature intended to include corrections officers and jailers as peace officers in Section 31–20A–5(A).

{21} In *Ogden*, this Court emphasized the "peace-keeping nature" of the duties of CSOs and the dangerousness of their peace-keeping role. 118 N.M. at 245, 880 P.2d at 856. As the Legislature has expressly indicated, corrections officers and jailers also serve a peace-keeping role, and their position is even more potentially dangerous than that of CSOs, who "have less frequent contact with suspects who are known to be dangerous." *Id.* at 244, 880 P.2d at 855. Through Section 33–1–10 and Section 33–3–28, the Legislature has demonstrated its intent to protect corrections officers and jailers and to deter crimes against them during the course of their duties of maintaining order in penal facilities. Our application of Section 33–3–28 and Section 33–1–10 to the definition of "peace officer" in Section 31–20A–5(A) is consistent with our understanding in *Ogden* that the Legislature intended a broad interpretation of this aggravating circumstance to advance the purpose of protecting those who maintain order.

{22} We reject Defendants' argument that Section 31–20A–5(A) would be duplicative of Section 31–20A–5(E) by holding that "peace officer" includes corrections officers. While it is true that Section 31–20A–5(E) protects employees of the Department of Corrections, it does not protect jailers, including employees of independent contractors such as GCCF, whom the Legislature expressly designated as peace officers under certain circumstances. In addition, this provision applies not only to corrections officers employed by the Department but to all Department employees. Similarly, Section 31–20A–5(D) is not duplicative of Section 31–20A–5(A) because Section 31–20A–5(D) also applies to individuals other than corrections officers, including visitors and other inmates. As shown by the scope of these provisions,

Section 31–20A–5(E) and Section 31–20A–5(D) are designed to deter murders committed by inmates. Unlike Section 31–20A–5(A), these provisions would not provide the same level of protection against murders committed by someone other than an inmate against a corrections officer who is carrying out an official duty, for example, a murder of a corrections officer by an individual attempting to help an inmate escape. By contrast to Section 31–20A–5(D) and Section 31–20A–5(E), "[t]he killing-of-a-peace-officer aggravating circumstance is designed to make criminals think twice before firing at a dark uniform." *Ogden*, 118 N.M. at 244, 880 P.2d at 855. By designating corrections officers and jailers as peace officers under certain circumstances, we believe the Legislature intended to provide them with the extra protection and added deterrent value of Section 31–20A–5(A). The three aggravating circumstances identified by Defendants serve different purposes and apply in different situations; these provisions do not become duplicative merely because there is probable cause to meet two of them under the facts of this case.

{23} We also reject Defendants' reliance on the rule of lenity. As we noted in *Ogden*, this rule applies only if traditional rules of statutory construction prove futile in ascertaining a statute's meaning. 118 N.M. at 242, 880 P.2d at 853. As our analysis above illustrates, the meaning of "peace officer" in Section 31–20A–5(A) can be discerned by traditional rules of statutory construction, such as reading the provision together with statutes in pari materia, and after applying these rules, we are not left with the insurmountable ambiguity that would trigger application of the rule of lenity. We conclude that "peace officer" in Section 31–20A–5(A) includes jailers and corrections officers while they are engaged in the duties for which the Legislature designated them to be peace officers in Section 33–3–28 and Section 33–1–10.

## B. Whether GCCF Employees are Jailers or Corrections Officers

{24} Defendants argue that GCCF employees are not "jailers" within the meaning of Section 33–3–28 because the statute

defines "jailer" as "any employee of a local jail who has inmate custodial responsibilities, including those persons employed by private independent contractors who have been designated as jailers by the sheriff," Section 33–3–28(D)(1). Defendants also contend that the requirement of designation by the sheriff is supported by NMSA 1978, § 29–1–9 (1979), which requires appointment in writing by state authorities in order to exercise the powers of a peace officer. Defendants argue that, because the employees of GCCF were not designated by the Guadalupe County Sheriff, as required of jailers in Section 33–3–28(D)(1), they do not have the peace officer powers stated in Section 33–3–28(A). We disagree.

{25} The Legislature expressly declared that "any employee of a local jail who has, at the particular time, the principal duty to hold in custody any person accused or convicted of a criminal offense or placed in the legal custody or supervision of a local jail shall have the power of a peace officer" under the same circumstances empowering jailers as peace officers. Section 33–3–28(A). Therefore, the Legislature did not make designation as a jailer by the sheriff a necessary condition for peace officer status under this statute. For this reason, Defendants' reliance on Section 29–1–9 as a basis for requiring designation by the sheriff is misplaced. Section 33–3–28(D)(2) defines a "local jail" as "a facility operated by a county, municipality or combination of such local governments or *by a private independent contractor pursuant to an agreement with a county, municipality or combination of such local governments and used for the confinement of persons charged with or convicted of violation of a law or ordinance.*" (Emphasis added.) GCCF is an independent contractor pursuant to a contract with the board of commissioners of Guadalupe County. It houses inmates who have been convicted of crimes based on a contract between Guadalupe County and the Department of Corrections. Therefore, GCCF is a local jail under Section 33–3–28(D), and its guards are "employees of a local jail" who have the powers of a peace officer under the circumstances specified in Section 33–3–28(A).

{26} In addition, although the definition of "jailer" includes designation by the sheriff, the Legislature has also provided that "[t]he common jails shall be under the control of the respective sheriffs, independent contractors or jail administrators hired by the board of county commissioners or other local public body or combination thereof." Section 33–3–1(A). In *Ogden*, this Court held that formal, specific legislative action was not necessary to confer peace officer status on CSOs:

> the fact that CSOs hold their public employment is what vests them by law with the duty to maintain public order. There is no need for specific legislation stating that the CSOs are vested by law to maintain public order. Such a judicial construction employs an artificial and unduly narrow definition of the term "vested by law," and it incorrectly deprives the legislature of the ability to enact broad, general statutes.

118 N.M. at 245, 880 P.2d at 856. Similarly, in this case, GCCF's contract with the board of commissioners of Guadalupe County, a contract which is specifically authorized by law, Section 33–3–1(B); NMSA 1978, § 33–3–26(A) (1984), vested GCCF's employees with the authority to act as jailers. By virtue of the contract, GCCF employees "are literally clothed with the authority of the State." *Ogden*, 118 N.M. at 245, 880 P.2d at 856. While the Legislature contemplated that the sheriff undertake the additional ministerial act of designating the guards of independent contractors as jailers, the plain language of Section 33–3–28(A) indicates that the Legislature did not intend for the failure to perform this ministerial act to strip the guards of local jails of the powers of a peace officer. Otherwise, this technical deficiency would deprive prison guards of the necessary ability to arrest and enforce laws against the inmates they are guarding, thereby preventing them from maintaining order. *Cf. Gutierrez*, 115 N.M. at 552, 854 P.2d at 879 ("To reach the result advocated by Defendant, we would have to hold that the legislature ... intended to deprive [juvenile corrections officers] of the power to prevent violations of law on the grounds of the various juvenile facilities located in this state. This would be

an absurd interpretation of the legislature's action ...."). This construction of Section 33–3–28 would frustrate the legislative purpose of maintaining order that prompted the Legislature to extend peace officer powers to guards at local jails.

{27} In *Ogden*, we determined that, "[r]ather than over-literalize the 'vested by law' language in the statutory definitions, our emphasis should focus on the maintenance of public order or peace requirement, the more substantive and limiting language of the definitions." 118 N.M. at 245, 880 P.2d at 856. We again decline to "hobble statutory interpretation" with "an artificial and unduly narrow" construction of the statute. *Id.* at 244–45, 880 P.2d at 855–56. We believe that Section 33–3–28 confers peace officer powers, under enumerated circumstances, to the employees of GCCF whose principal duty is to hold in custody persons convicted of a criminal offense.

## C. Whether Garcia was a Jailer or Corrections Officer at the time of the Alleged Murder

{28} Defendants argue that there is no evidence that Garcia was making an arrest or enforcing the laws at the time of his alleged murder and that the statutory designation of jailers and corrections officers thus does not apply. This factual argument was not raised in Defendants' motions to dismiss and was not a subject of the limited *Ogden* evidentiary hearing. As a result, this issue is not properly before this Court on interlocutory appeal. *See* Rule 12–216(A) NMRA 2004. In any event, we determine that the State established probable cause to believe that Garcia was murdered while in the lawful discharge of duties conferring peace officer status. Section 33–3–28(A). Based on this Court's holding in *Rhea* that jailers maintain the public order, we believe that the Legislature intended its reference to "enforcement of laws" in Section 33–3–28(A) and Section 33–1–10(A) to apply to the duty of corrections officers to maintain order in the correctional facility,[3] which was one of

Garcia's primary duties at GCCF. Defendant Sanchez noted in his motion to dismiss that it was undisputed that Garcia was engaging in his duties as a corrections officer at the time of the killing. This fact is supported by references at the evidentiary hearing to a riot, as well as by the supplemental authority submitted to this Court by Defendants on appeal, which indicates that the United States Department of Justice denied federal death benefits to Garcia's widow and also recites that Garcia's death occurred while he was responding to a physical altercation between inmates. There is probable cause to believe that Garcia, while trying to maintain order, was enforcing the law at the time of his alleged murder and thus acting in his capacity as a peace officer.

{29} Finally, Defendants contend that Garcia was not a corrections officer because he had not completed training from the Department of Corrections. Defendants rely on the statutory requirement that "[m]embers of the corrections department correctional officer force, excluding correctional specialists, ... successfully pass any physical and aptitude examination the department may require." NMSA 1978, § 33–1–11(E) (1986). As described above, Defendants introduced evidence that Garcia failed to successfully pass a rifle test and that the Department of Corrections notified GCCF, after Garcia's death, that those who had not been certified by the Department were not to serve as corrections officers.

{30} We do not believe that Garcia's failure to retake the rifle test nullifies his status as a peace officer under Section 33–3–28 as a matter of law. Section 33–1–11(E) does not apply to jailers and employees of local jails designated as peace officers. Section 33–3–28(B) specifically provides that "[j]ailers who are employees of an independent contractor shall not be required to attend the basic training program for law enforcement officers at the New Mexico law enforcement academy." In addition, the statute that allows the Department of Corrections to contract for correctional or jail services provides

---

3. Contrary to Defendant Sanchez's contention, nothing in *Gutierrez* contradicts this interpretation of the Legislature's intent or otherwise ex-

empts custodial duties from the peace officer powers of corrections officers. *See Gutierrez*, 115 N.M. at 552, 854 P.2d at 879.

that "[w]hen the contractor begins operation of a facility for which private contractor operation is authorized, his [or her] employees performing the functions of correctional officers shall be deemed correctional officers for the purposes of Section[ ] 33–1–10," which empowers corrections officers to act as peace officers. NMSA 1978, § 33–1–17(E) (1995). Although this independent contractor provision does not apply in this case because GCCF had a contract with the County instead of with the Department of Corrections, it is noteworthy that this statute does not require individual officer compliance with training requirements in order for the independent contractor employee to be considered a peace officer. The Legislature deemed the key factors for peace officer status to be the performance of the functions of correctional officers and the existence of a contract between the employer and the public body responsible for the operation of a corrections facility. These factors were met in the present case.

{31} A defect in a guard's training might affect the independent contractor's compliance with the government contract. *See* NMSA 1978, § 33–3–27(C) (providing that an agreement with a private independent contractor for the operation of jails "shall provide for the independent contractor to provide and pay for training for jailers to meet minimum training standards which shall be specified in the contract"), (F)(2) (2001) (providing for termination of the contract for cause if the independent contractor fails to meet a contract provision that "seriously affects the operation of the jail"). The County's contract with Wackenhut in this case, for example, required that its corrections officers be trained by the Department. Nonetheless, we believe that the Legislature did not intend to deprive employees of independent contractors of the authority necessary to carry out the important and dangerous functions of a corrections officer based on an independent contractor's failure to fully comply with contractual obligations. As in *Ogden,* we believe our focus should be on the maintenance of public order requirement. 118 N.M. at 245, 880 P.2d at 856. GCCF, pursuant to statutorily authorized public contracts, employed Garcia to hold inmates in custody and to maintain order. Garcia performed the duties of a jailer pursuant to GCCF's contract with the County, and he was responsible for maintaining order and holding in custody inmates of the Department of Corrections. As the district court noted, "Garcia's duties, training uniform and risks differed in no significant way from corrections officers or jailers in other state or private correctional institutions in New Mexico." The State established probable cause to believe that Garcia was acting in the lawful discharge of his duties conferring peace officer status. Under these circumstances, we believe the Legislature would have intended for Garcia to have the powers of a peace officer in order to fulfill his duties and would have intended to deter inmates and others from committing violent crimes against him and against the other guards at GCCF. As a result, we believe that there is probable cause for this aggravating circumstance.

{32} Moreover, unlike the question whether corrections officers or independent contractor jailers are, generally, peace officers within the meaning of Section 31–20A–5(A), which is clearly a question of law, we believe that the question whether, under the circumstances in this case, Garcia had the powers of a peace officer raises a mixed question of fact and law. "When the applicability of an aggravating circumstance raises a question of fact or a mixed question of fact and law, the district court should grant the defendant's motion to dismiss the aggravating circumstance only when it finds that there is not probable cause to support the aggravating circumstance." *Ogden,* 118 N.M. at 240, 880 P.2d at 851. "The district court must not weigh the evidence . . . ." *Id.* By establishing that GCCF had a contract with the County, that Garcia was employed by GCCF as a corrections officer, and that he was performing the duties of a corrections officer at the time of his death, we believe that the State established probable cause to believe that Garcia was a peace officer within the meaning of Section 31–20A–5(A). We leave for the jury the resolution of any disputed facts surrounding Garcia's status as a peace officer and his performance of duties conferring peace officer status at the time of

**472**

his killing. *See* UJI 14–7014 NMRA 2004 (requiring the jury to find beyond a reasonable doubt that the victim was a peace officer and was performing the duties of a peace officer at the time of the murder in order to find the aggravating circumstance of murder of a peace officer). Under the facts and issues presented below, we believe these questions are not properly resolved by pretrial order. We hold that the State satisfied its burden of establishing probable cause for the aggravating circumstance of murder of a peace officer.

## IV. Conclusion

{33} We conclude that the State established probable cause to believe that GCCF is a penal institution in New Mexico and that Garcia was lawfully on the premises of GCCF when he was allegedly murdered. As a result, we affirm the district court's denial of Defendants' motion to dismiss with respect to the aggravated circumstance listed in Section 31–20A–5(D). We further hold that jailers and corrections officers are peace officers within the meaning of Section 31–20A–5(A) and that the State established probable cause to believe that the guards at GCCF, and Garcia in particular, had peace officer powers at the time of the killing. We therefore also affirm the district court's denial of Defendants' motion to dismiss with respect to the aggravated circumstance of murder of a peace officer. We remand to the district court for further proceedings.

{34} **IT IS SO ORDERED.**

MAES, C.J., MINZNER, J., BOSSON and CHAVEZ, JJ., concur.